JDS Dev. LLC v Parkside Constr. Bldrs. Corp. (2024 NY Slip Op 04227)

JDS Dev. LLC v Parkside Constr. Bldrs. Corp.

2024 NY Slip Op 04227

Decided on August 15, 2024

Appellate Division, First Department

Friedman, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: August 15, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Cynthia S. Kern David Friedman Kelly O'Neill Levy Marsha D. Michael

Index No. 655477/2018 Appeal No. 1608-09 Case No. 2022-03662 2022-03664 

[*1]JDS Development LLC, Doing Business as JDS Development Group, et al., Plaintiffs-Appellants,
v
Parkside Construction Builders Corp., Defendant, Allied World Insurance Company, Defendant-Respondent.

Plaintiffs appeal from a judgment of the Supreme Court, New York County (Andrea Masley, J.), entered August 8, 2022, dismissing the complaint against defendant Allied World Insurance Company, and bringing up for review an order, same court and Justice, entered July 28, 2022, which granted Allied's motion for summary judgment dismissing the complaint against it and denied plaintiffs' motion for summary judgment on its surety claim against Allied.

Cohen Ziffer Frenchman & McKenna LLP, New York (Andrew N. Bourne, Robin L. Cohen and Victoria T. Salami of counsel), for appellants.
Chiesa Shahinian & Giantomasi PC, New York (Adam P. Friedman of counsel), for respondent.

FRIEDMAN, J. 

At issue on this appeal is a performance bond written on the form known as "AIA Document A312" (the A312 bond). The A312 bond, which is published by the American Institute of Architects, has been described as "one of the clearest, most definitive, and widely used type of traditional common law 'performance bonds' in private construction" (4A Bruner & O'Connor on Construction Law § 12:16 [2024]). The form "was developed to define clearly . . . the 'trigger' of the surety's obligation to perform," among other variables (id.). With regard to the "trigger" of the surety's obligation, paragraph 3 of the A312 bond provides that "the Surety's obligation under this Bond shall arise after" (emphasis added) the beneficiary of the bond (1) has notified the surety and the principal that it is considering declaring a default and offered to confer with the surety and the principal to discuss how to proceed, (2) has declared a default and formally terminated the principal's right to complete the contract no earlier than 20 days after the aforementioned notice, and (3) has agreed to pay the balance of the contract price to the surety or to a new contractor chosen by the surety.
The Court of Appeals has recognized that the beneficiary's compliance with the procedures prescribed by paragraph 3 of the A312 bond is generally a condition precedent to an action to recover upon such a bond (see Walter Concrete Constr. Corp. v Lederle Labs., 99 NY2d 603, 605 [2003] [noting that an action on an A312 bond is "tied to a declaration of default" and that "a precursor to liability under the (A312) bond . . . (is that) predefault notification be given to the contractor and surety by the owner"]). In this case, in which the bond covered the principal's work only through the 36th floor of an 85-story building, the beneficiary of the bond did not carry out the procedures specified by paragraph 3 of the A312 bond — the notification of a potential default, the offer to confer, and the declaration of default and termination of the principal — until long after the principal had completed, and had been paid for, the portion of the work covered by the bond. The beneficiary therefore cannot prevail on its claim against the surety under the A312 bond for damages caused by delays in the principal's performance [*2]of the covered portion of the work (i.e., through the 36th floor). Accordingly, we affirm the order granting the surety summary judgment dismissing that claim.
The dispute before us arises from the construction of the Steinway Tower, an 85-story skyscraper at 105-111 West 57th Street in Manhattan, and, more specifically, from the performance of the subcontract for the construction of that building's superstructure (the steel and concrete structure of the building rising above the foundation).[FN1] The superstructure subcontract, in its original form (the 85-floor subcontract), was executed in 2015 between nonappearing defendant Parkside Construction Builders Corp., as subcontractor, and plaintiff JDS Construction Group LLC, as construction manager.[FN2] The 85-floor subcontract required Parkside, in return for a contract price of $39.7 million, to perform "all work from the cellar slab up in the Superstructure scope" in accordance with a schedule that set out certain project milestone dates, the completion of which was deemed to be "of the essence." With regard to timely completion of its work, Parkside assumed liability to JDS and the property owner for any losses caused by Parkside's "delay [of] the timely progress of the Work." The 85-floor subcontract also obligated Parkside to obtain, within 10 days after JDS's request, a performance bond "in form similar to the [A312 bond], and otherwise satisfactory to [JDS], guaranteeing the due and prompt performance of all of the terms of this Agreement on the part of [Parkside] to be performed," in a penal amount "equal to the Contract Price of the Agreement."
In 2016, Parkside approached defendant Allied World Insurance Company to request the issuance of a performance bond covering Parkside's work under the 85-floor subcontract. Allied declined this request because, due to restrictions in its reinsurance treaty, it was unable to execute a bond in a penal sum exceeding $25 million. To enable Allied to bond Parkside's work, JDS prepared a modified version of Parkside's subcontract, covering the superstructure work only from the cellar through the 36th floor and setting forth a reduced contract price of $24,940,383.04, based on the value of that portion of the work under the "schedule of values" appended to the 85-floor subcontract. Apart from the limitation of the scope of the covered work and the commensurate reduction of the contract price, the terms of the modified subcontract (the 36-floor subcontract) are substantially identical to the terms of the 85-floor subcontract. Under the contractual schedule for Parkside's work, completion of the 36th floor was due on October 13, 2016.
On or about April 6, 2016, after a copy of the unexecuted 36-floor subcontract had been furnished to Allied, Allied, as surety, and Parkside, as principal (otherwise referred to as "contractor"), executed a performance bond in favor of JDS on the aforementioned A312 form (the 36-floor bond).[FN3] The signature page of the 36-floor bond [*3]states that it pertains to the construction contract covering "Superstructure (Cellar — 36th Floor) Located at 105-111 West 57th Street, New York, New York 10019." The signature page of the 36-floor bond further states that its penal sum is in the amount of $24,940,383, the contract price under the 36-floor subcontract (less four cents).[FN4]
The relevant provisions of the 36-floor bond are as follows:
The Contractor [Parkside] and the Surety [Allied], jointly and severally, bind themselves . . . to the Owner [JDS] for the performance of the Construction Contract [i.e., the 36-floor subcontract], which is incorporated herein by reference.
If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.
If there is no Owner Default, the Surety's obligation under this Bond shall arise after [emphasis added]:
The Owner has notified the Contractor and Surety . . . that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and
The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and
The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.
When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:
Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or
Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or
Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence . . . ; or
Waive its rights to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:
.1 After investigation, determine the amount for which it may be liable to the Owner [*4]and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or
.2 Deny liability in whole or in part and notify the Owner citing reasons therefor. . . .
. . . To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:
The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;
Additional legal, design, professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and
Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.
The record reflects that, within a short time after the date of the 36-floor bond (April 6, 2016), JDS began to find fault with Parkside's work. While other deficiencies in Parkside's performance were identified (such as the failure to provide a rigging crew and a concrete safety manager), JDS's biggest complaint concerned Parkside's failure to keep pace with the contractual construction schedule, since Parkside's delays had a ripple effect on other subcontractors, leading to increased costs for the project owners.
As early as May 2016, JDS began considering terminating Parkside and, to that end, solicited bids from possible replacement contractors. Ultimately, however, JDS decided against terminating Parkside because (in the words of Michael Stern at his deposition) "the cost to make that switch would be worse and more damaging than fighting through the job with Parkside until the end." Stern explained that the potential replacement contractors would not be able to start working "immediately, which would have had a greater schedule impact . . . So for that reason we decided given that Parkside at least had men on the job, and men available, we would painfully stick with Parkside."
As a result of the delays in Parkside's performance, Parkside did not complete its work through the 36th floor until October 31, 2017 — more than a year after the contractual due date of October 13, 2016, for completion through the 36th floor. In November 2017, JDS paid Parkside in full for its work through the 36th floor.
In spite of Parkside's laggard performance, JDS granted Parkside a "contract adjustment" in October 2017 that retroactively increased the price of Parkside's work through the 85th floor to approximately $59 million — a raise of more than $19 million above the original contract price of $39.7 million. The revised schedule of values attached to the contract adjustment reflects an increase in the price of Parkside's work through the 36th floor from $24,940.383.04 to $41,314,086.59 — an increase of more than $16 million.
Parkside continued its work on the project [*5]until May 16, 2018, when indictments against Parkside and its principals for wage theft and workers compensation insurance fraud were unsealed. At that point, Parkside — whose work had as of that time progressed to between the 55th and 60th floors of the superstructure — abandoned the project.
On June 1, 2018 — approximately half a year after Parkside had completed the work covered by the 36-floor bond and had been paid in full for that work — JDS sent Allied and Parkside a letter stating, in accordance with paragraph 3.1 of the 36-floor bond, that it was "considering declaring a contractor default" and requesting that a conference be held within 15 days "to discuss methods of performing the Construction Contract." Allied did not respond to this letter. On August 9, 2018, JDS sent Allied and Parkside a letter formally declaring Parkside to be in default under its subcontract, without specifying whether the default was under the 85-floor subcontract or under the 36-floor subcontract. On August 14, 2018, JDS sent Allied and Parkside a letter formally terminating Parkside from the project.
Thereafter, by letter to Allied dated August 21, 2018, JDS (1) claimed that its August 9 and August 14 letters had complied with subparagraphs 3.1 and 3.2, respectively, of the 36-floor bond; (2) asserted that the requirement of subparagraph 3.3 of the bond (that JDS "agree to pay the Balance of the Contract Price to [Allied]" or to a contractor selected by Allied) was "inapplicable because the Owner's claims against the Contractor exceed any available balance of the Owner/Contractor contract"; and (3) "call[ed] upon [Allied] to timely fulfill its obligations under the Bond." The August 21 letter stated that JDS "estimated the total liability to [JDS] significantly exceeds the Amount set forth in the [36-floor] Bond." A subsequent letter from JDS to Allied, dated August 24, 2018, enclosed JDS's summary of the damages it claimed to have suffered as a result of Parkside's various breaches. The total amount of damages alleged by JDS was $89,485,264.51, of which the large majority — $78,256,061.86 — comprised additional costs that JDS attributed to Parkside's 382-day delay (from October 13, 2016, through October 30, 2017) in completing the superstructure through the 36th floor. Allied's response to JDS's demand for payment under the 36-floor bond was that the information JDS had supplied was "not sufficient to establish liability under the bond," and to request a sworn proof of claim and the production of various categories of documents.
In November 2018, JDS commenced this action against Parkside (which has defaulted) and Allied. The cause of action against Allied seeks to recover the entire penal sum of the 36-floor bond ($24,940,383.00). After engaging in discovery, JDS and Allied made competing motions for summary judgment. The parties' arguments focused on two issues. The first issue was whether the procedures specified by paragraph 3 of the 36-floor bond were conditions [*6]precedent to the beneficiary's recovery of delay damages from the surety and, if so, whether JDS had satisfied those conditions by carrying out the paragraph 3 procedures after the bonded work was complete. The second issue was whether the plaintiff entities bringing this action — JDS Development LLC doing business as JDS Development Group (the named beneficiary of the 36-floor bond) and JDS Construction Group LLC (which, as construction manager, had entered into the 85-floor subcontract with Parkside) — had standing to bring this action, notwithstanding that they had not actually incurred the losses for which recovery is sought under the 36-floor bond, by virtue of a liquidating agreement among themselves and two other affiliated entities (111 West 57th Holdings LLC and 111 West 57th Property Owner LLC).[FN5] In the order appealed from, Supreme Court decided both issues, as a matter of law, in Allied's favor and, accordingly, granted Allied's summary judgment motion, while denying the motion by JDS.
Upon JDS's appeal, we affirm on the ground that JDS's claim for delay damages under the 36-floor bond is barred by JDS's failure to have complied, at any time before the bonded work had been completed, with the condition precedent of the notice and termination procedures specified in paragraph 3 of the bond. Since this determination suffices to require dismissal of the claim against Allied, we need not reach the question of whether the liquidating agreement validly conferred standing upon JDS to bring this action.
In challenging Supreme Court's determination that this action is barred by JDS's failure to satisfy the 36-floor bond's conditions precedent to a valid claim thereunder, JDS acknowledges, as it must, that there is at least a "general rule of New York law . . . that Section 3 of the [36-floor] Performance Bond creates conditions precedent to a surety's liability." As noted at the outset of this opinion, the Court of Appeals recognized more than 20 years ago that the procedures outlined in paragraph 3 of the A312 bond —notice that default is being considered, an offer to confer, notice of default, termination, and agreement to pay the contract balance — are "a precursor to liability under the bond" (Walter Concrete, 99 NY2d at 605).[FN6]
Since Walter Concrete, New York courts have given effect to the Court of Appeals' recognition that paragraph 3 of the A312 bond — which, to reiterate, provides that the surety's obligation "shall arise after" the beneficiary complies with the procedures set forth in subparagraphs 3.1, 3.2 and 3.3 — creates mandatory conditions precedent to a valid claim under the bond (see Prismatic Dev. Corp. v International Fidelity Ins. Co., 221 AD3d 469, 469 [1st Dept 2023] ["Strict compliance with these conditions precedent (set forth in paragraph 3 of the A312 bond) is required because a failure to comply with such preconditions deprives the surety of its options" for completing the bonded work under paragraph 4]; Independent [*7]Temperature Control Servs. v Parsons Brinckerhoff, Inc., 159 AD3d 636, 637 [1st Dept 2018] [the surety under an A312 bond "established prima facie that it is not liable under the performance bond . . . because (the beneficiary) failed to mail it notice of the termination of the subcontract . . . before paying a replacement contractor"]; Granger Constr. Co., Inc. v TJ, LLC, 134 AD3d 1329, 1331 [3d Dept 2015] [because "paragraph 3 clearly states that (the surety's) obligation under the bond 'shall arise' only after (the beneficiary) had performed the three conditions detailed in sections 3.1 to 3.3, this language unambiguously created conditions precedent"]; Archstone v Tocci Bldg. Corp. of N.J., Inc., 119 AD3d 497, 498 [2d Dept 2014] ["paragraph 3 of the subject AIA A312 performance bond contains express conditions precedent to the liability of the surety under the bond"]; Tishman Westwide Constr. LLC v ASF Glass, Inc., 33 AD3d 539 [1st Dept 2006] [same]; 153 Hudson Dev., LLC v DiNunno, 8 AD3d 77, 78 [1st Dept 2004] [same]; see also 120 Greenwich Dev. Assocs., LLC v Reliance Ins. Co., 2004 WL 1277998, *12, 2004 US Dist LEXIS 10514, *34-35 [SD NY June 7, 2004, 01 Civ. 8219 (PKL)] [same]).).
Faced with the foregoing authority, JDS argues that, while the paragraph 3 requirements may be preconditions for requiring the surety to complete the defaulting contractor's work, they should not be deemed to constitute conditions precedent to a claim for delay damages. JDS apparently reasons that, since the bonded contractor may be held liable for delay damages even if the delay is not sufficiently egregious to warrant termination, or even if the owner chooses not to terminate, the surety, as guarantor of the contractor's performance, should be required to pay delay damages under the bond regardless of the beneficiary's compliance with the paragraph 3 procedures. Moreover, as JDS's argument goes, once there has been a delay in performance, the cost of that delay cannot be avoided through the options afforded the surety under paragraph 4 of the A312 bond, so the notice and conferral provisions of paragraph 3 are not essential. JDS argues that its position finds support in 1199 Hous. Corp. v International Fid. Ins. Co. (14 AD3d 383 [1st Dept 2005]) and in a federal court decision applying New York law, International Fid. Ins. Co. v County of Rockland (98 F Supp 2d 400 [SD NY 2000]). We are not persuaded.
To begin, the A312 bond provides flatly that the surety's obligations "shall arise after" the beneficiary complies with the procedures set forth in paragraph 3. As previously discussed, it is well established under New York law that this language creates a condition precedent, and nothing in the bond excludes the surety's potential obligation to pay delay damages from the scope of "the Surety's obligation under this Bond" that paragraph 3 directs "shall arise after" (emphasis added) there has been compliance with the procedures set forth in subparagraphs 3.1, 3[*8].2, and 3.3. Further, a performance bond is not insurance against the cost of any breach by the principal, but, rather, a guarantee of the principal's performance that is triggered only upon the termination of the principal from the project for a breach sufficiently egregious to constitute a default warranting termination (see Michael De Chiara and Michael Zetlin, eds., New York Construction Law § 7.12[A] [2003] ["A surety's liability on a performance bond does not arise until there has been a default by the principal"]; id. § 7.12[B] ["a surety may not be liable on a performance bond until both a default has occurred, and the owner has terminated the contract pursuant to the terms contained therein"]). Thus, even though delay damages cannot be avoided once the delay has taken place, the surety's obligation to pay those past damages is only triggered if, and when, the beneficiary follows the notice and termination procedures of paragraph 3 of the A312 bond.[FN7]
The conclusion that the paragraph 3 preconditions to a surety's liability under the A312 bond apply to delay damages also finds support in case law (see 153 Hudson, 8 AD3d 77, affg 2003 WL 25520440 [Sup Ct, NY County May 13, 2003, No. 603536/00] [affirming a decision that dismissed all claims under a performance bond, "including the delay claims," based on the beneficiary's failure to satisfy the paragraph 3 conditions precedent]; see also 120 Greenwich, 2004 WL 1277998, *12, 2004 US Dist LEXIS 10514, *34 [the conditions precedent created by paragraph 3 of the A312 bond "apply . . . to (the surety's) obligations for delay costs and other damages under Paragraph 6"]; cf. Prismatic, 221 AD3d at 470 ["The conditions precedent unambiguously apply to all of (the surety's) obligations, including its obligation to (assume the principal's post-performance contractual duty to) defend and indemnify plaintiff" from claims arising from the principal's work]; Archstone, 119 AD3d at 498 [the paragraph 3 conditions precedent to the surety's liability applied to the owners' postcompletion claims for water damage due to the contractor's "faulty design and construction"]; Arch Ins. Co. v Graphic Builders, 36 F4th 12, 18 [1st Cir 2022] [under Massachusetts law, rejecting a beneficiary's argument that "a post-completion warranty obligation is not reasonably subject to section 3's termination requirement"]).[FN8]
JDS also argues that it ultimately did comply with the procedures of paragraph 3 of the 36-floor bond when it issued the prescribed notices in June and August of 2018, after JDS's abandonment of its work between the 55th and 60th floors. The short answer to this contention is that, as previously discussed, a surety's obligations under a performance bond are triggered, after compliance with other required procedures, by the termination of the principal from the bonded work — an event that can happen only while the bonded work is still in progress. In this case, the bonded work, which ended at the 36th floor[*9], had been completed seven months before JDS issued the notice that it was considering declaring Parkside in default, upon Parkside's abandonment of the job after it had progressed about 20 floors beyond the scope of the bonded work. While JDS was certainly entitled to declare a default and to terminate Parkside at that point, those actions were without force and effect as to the 36-floor bond. JDS never invoked its rights under that bond while the work it covered was in progress, and when it finally acted (long after the bonded work had been completed), the time for such action had long since passed.
Finally, JDS argues that its decision not to declare a default and terminate Parkside was economically rational, since it might well have faced a greater loss from the delays attendant on bringing on a new contractor than from continuing to put up with Parkside. While JDS may have made the correct business decision in choosing between the costs of keeping Parkside on the job, on the one hand, and the costs of firing it, on the other hand, this does not entitle JDS to obtain the benefits of the 36-floor bond without complying with that bond's material terms. Terminating Parkside to preserve JDS's rights to the benefit of a $25 million bond may not have made economic sense if it would have resulted in even greater delays in the construction of a billion-dollar skyscraper. However, having made the choice it did, JDS must now live with the legal consequences of that choice. One cannot have one's cake and eat it, too.[FN9]
We have considered JDS's remaining arguments concerning the conditions precedent to its right to recover under the 36-floor bond and find them unavailing.
Accordingly, the judgment of the Supreme Court, New York County (Andrea Masley, J.), entered August 8, 2022, dismissing the complaint against defendant Allied World Insurance Company, and bringing up for review an order, same court and Justice, entered July 28, 2022, which granted Allied's motion for summary judgment dismissing the complaint against it and denied plaintiffs' motion for summary judgment on its surety claim against Allied, should be affirmed, with costs. Appeal from aforesaid order, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.
Judgment, Supreme Court, New York County (Andrea Masley, J.), entered August 8, 2022, affirmed, with costs. Appeal from order, same court and Justice, entered July 28, 2022, dismissed, without costs, as subsumed in the appeal from the judgment.
Opinion by Friedman, J. All concur.
Manzanet-Daniels, J.P., Kern, Friedman, O'Neill Levy, Michael, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: August 15, 2024

Footnotes

Footnote 1: The Steinway Tower is reported to be the fourth tallest building in the United States and the narrowest skyscraper in the world, with a width-to-height ratio of 1:24 (see http://en.wikipedia.org/wiki/111_West_57th_Street).

Footnote 2: JDS Construction Group LLC, along with its co-plaintiff, JDS Development LLC doing business as JDS Development Group (collectively, JDS), are affiliated with each other and with 111 West 57th Partners LLC, the entity identified as the owner of the property by the 85-floor subcontract. It is undisputed that, at all relevant times, Michael Stern was a senior executive of each of these related entities.

Footnote 3:JDS does not dispute that the 36-floor subcontract — although never executed by JDS and Parkside — is the operative underlying agreement for purposes of the 36-floor bond. We note that the particular entity identified by the bond as "owner" of the project (i.e., the bond's beneficiary) is "JDS Development Group." We also observe that, although both the 85-floor subcontract and the 36-floor subcontract called for the use of the 2010 version of the A312 bond form (A312-2010), the 36-floor bond was written on the 1984 version of the A312 bond (A312-1984).

Footnote 4: Allied also issued a payment bond guaranteeing Parkside's payment of sums owed for labor, materials and equipment furnished for use in the performance of the 36-floor subcontract. The payment bond is not at issue on this appeal.

Footnote 5: JDS represents that 111 West 57th Holdings LLC and 111 West 57th Property Owner LLC comprise the "owner" of the property involved in the project. Michael Stern signed the liquidating agreement on behalf of each of the four entities that is a party to it.

Footnote 6: Walter Concrete involved a claim made on a bond written on an earlier AIA form (the AIA-311), which was held to "contain [] no explicit provision requiring a notice of default as a condition precedent to any legal action on the bond" (id.). The Court of Appeals observed: "Had the parties to the contract desired notice of default as a precursor to liability, they could have elected to issue the more specific [A312 bond], which by its terms requires predefault notification to be given to the contractor and surety by the owner" (id.).

Footnote 7: Of course, if the contractor's performance is tainted by endemic delays over an extended period of time, the beneficiary's compliance with the paragraph 3 procedures while the bonded work is still being performed will enable the surety to take steps pursuant to paragraph 4 to minimize post-termination delays going forward.

Footnote 8: JDS's reliance on 1199 Housing (14 AD3d 383) and County of Rockland (98 F Supp 2d 400) is unavailing. In 1199 Housing, we affirmed the denial of a motion to dismiss a claim against a surety for delay damages based solely on the defendant surety's failure to sufficiently plead the affirmative defense of noncompliance with a condition precedent (see 14 AD3d at 384). To the extent County of Rockland — a nonbinding federal court decision that was decided before Walter Concrete  held that the conditions precedent of paragraph 3 of the A312 bond do not apply to claims for delay damages, we decline to follow it, as did the court in 120 Greenwich (2004 WL 1277998, *12, 2004 US Dist LEXIS 10514, *34). 

Footnote 9: Since it is clear that JDS's claim under the 36-floor bond must be dismissed for the reasons already discussed, we need not consider whether the absence of any contract balance owed to Parkside excused JDS's compliance with subparagraph 3.3 of the bond ("agree[ing] to pay the Balance of the Contract Price to the Surety").